LAW OFFICE OF PETER A. ROMERO
Peter A. Romero, Esq.
503 Route 111
Hauppauge, New York 11788
(631) 257-5588
peteraromero@gmail.com

*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

JOHN DOE,

        Plaintiff,

  -against-                                      COMPLAINT

MICROSOFT CORPORATION,             *Jury Trial Demanded*

        Defendant.
-------------------------------------------------------x

      Plaintiff, JOHN DOE ("Plaintiff"), by and through his attorney, Peter A. Romero, Esq., complains and alleges as follows:

## NATURE OF THE ACTION

    1.    Plaintiff brings this action against Defendant, MICROSOFT CORPORATION ("Defendant" or "Microsoft") to redress Defendant's unlawful employment practices in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et seq., as amended by the ADA Amendments Act ("ADAAA") (collectively, the "ADA"), and the New York State Human Rights Law, New York Executive Law §290 et seq. ("NYSHRL").

    2.    Plaintiff is a highly skilled software engineer who provided dedicated service to Defendant. After undergoing surgery due to cancer, Plaintiff experienced medical complications for which he sought reasonable accommodation. Defendant resisted Plaintiff's requests and,

1

instead, constantly reassigned Plaintiff between various positions, some of which that were clearly inappropriate for Plaintiff's skill set and/or medical restrictions. None of Plaintiff's peers were reassigned as often, or as many times, as was Plaintiff in the period following his surgery. Ultimately, Defendant reassigned Plaintiff from a viable position to one that Defendant intended to eliminate, resulting in the termination of Plaintiff's employment.

3. Defendant's discriminatory discharge of Plaintiff because of his disability, because of his requests for reasonable workplace accommodations, and because of his complaints of discriminatory treatment, was knowing, malicious, willful and showed a reckless disregard for Plaintiff. Defendant's unlawful conduct caused and continues to cause Plaintiff to suffer loss of income and employment-related benefits as well as mental anguish and emotional distress.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337 and supplemental jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. §1367.

5. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §1391(b).

6. A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Suffolk County.

7. Plaintiff timely filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination under Charge Number 846-2014-14463.

8. The EEOC issued a notice of dismissal and Right to Sue on September 24, 2015.

9. Plaintiff commenced this action within ninety days of September 24, 2015.

**THE PARTIES**

10. At all times relevant, Plaintiff is and was a resident of Suffolk County and the State of New York.

11. At all times relevant, Plaintiff is and was an "employee" within the meaning of 42 U.S.C. 12111(4) and a "person" within the meaning of Section 292(1) of the NYSHRL.

12. At all times relevant, Plaintiff is and was a "qualified individual with a disability" within the meaning of the ADAA and NYSHRL.

13. Upon information and belief, Microsoft is a foreign corporation authorized to do business in New York.

14. At all times relevant, Microsoft has been an "employer" within the meaning of 42 U.S.C. 12111(5) and Section 292(5) of the NYSHRL.

**STATEMENT OF FACTS**

**Software Engineering Background and Employment with Microsoft**

15. Plaintiff studied practical electronic engineering and software engineering. From in or about 1995 to in or about 1998, he served as a computer science teacher in the military.

16. In 1998, Plaintiff commenced employment with Microsoft as a software engineer.

17. From in or about 1998 to in or about 2003, Plaintiff worked as a software development engineer and test lead for Microsoft Windows Message Queuing (MSMQ). During this time, Plaintiff worked on the development of Windows 2000, Windows XP and Windows 2003.

18. Plaintiff made major contributions to the Windows Product Team, including, but not limited to, building the team Basic Validation Test and implementing it as part of a method to

"push quality upstream;" building capabilities to evaluate the effectiveness of the Company's platform for its target customers by developing end to end use cases; designing and building automated test framework that runs on a distributed environment and verifies MSMQ in an end to end simulated environment; inventing and developing U.S. Patent # 7143132- distributing files from a single server to multiple clients via cyclical multicasting; designing tools to detect software security issues; and redesigning the migration for a robust MSMQ ISAPI filter.

19. As a result, Plaintiff was promoted to a team lead position in 2001 and led the MSMQ Windows XP and 2003 releases, and received a Microsoft Gold Star Award.

20. From in or about 2003 to in or about 2006, Plaintiff served as the Senior Software Development Lead for Microsoft Internet Security and Acceleration Server ("ISA Server"). Plaintiff received a Microsoft Gold Star Award for his performance in this role.

21. From in or about 2006 to in or about 2008, Plaintiff served as Senior Test Manager, guiding the integration of activities for two companies acquired by Microsoft.

22. In or about 2008, Plaintiff attended the Microsoft Leadership Potential Program.

23. In or about 2009, Plaintiff became the Performance Team Lead for Microsoft Forefront Security products in New York.

24. Plaintiff's team achieved dramatic performance improvements in Microsoft Forefront Security products that protect Exchange and Sharepoint and perform SPAM filtering in the cloud.

**Plaintiff Required Surgery Because of Cancer**

25. On September 2, 2011, Plaintiff underwent a right radical Orchiectomy (the surgical removal of a testicle) due to a seminoma of the right testicle, or testicular cancer, at Memorial Sloan Kettering Cancer Center ("MSKCC").

26. After his surgery, Plaintiff was subject to a surveillance protocol that required close monitoring by regular doctor appointments, CT scans, chest x-rays, physical examinations and blood tests designed to detect if the cancer recurs.

27. Thereafter, Plaintiff suffered recurrent scrotal infections, which caused him great pain and discomfort.

28. Within one month of the surgery, Plaintiff developed pain in his left testicle, which radiated to the left inguinal region. Serial CT scans demonstrated enlarging testicular artery in the left groin over time. During this period, Plaintiff worked a four-day workweek.

29. Each day, Plaintiff began to experience pain after four to six hours of working. Although Plaintiff obtained some relief while lying down, his pain worsened as the day progressed and after exercise. He also experienced pelvic testicular pain upon sitting for extended periods at work. Lying down alleviated Plaintiff's pain because it reduced

30. Plaintiff also suffered a decreased testosterone level causing him fatigue.

31. In or about September 2012, Plaintiff's manager informed him that he would have to either take a full-time leave or carry a full-time load.

**Defendant Discriminated Against Plaintiff**

32. On or about September 20, 2012, Plaintiff consulted with Joel Sheinfeld, M.D. ("Dr. Sheinfeld"), a board-certified urologic surgeon who specializes in surgery for patients with testicular cancer.

33. Plaintiff provided Defendant with a letter from Dr. Sheinfeld's office, dated October 4, 2012, stating that he had been suffering left scrotal pain and requesting that Plaintiff work light duty for three months to allow for further recovery and restricting Plaintiff from sitting for more than six hours per day.

5

34. In October 2012, Plaintiff submitted medical documentation to Defendant in support of his request to work a reduced schedule of thirty hours per week for a three-month period, from October 2, 2012 to December 31, 2012.

35. On or about October 4, 2012, Plaintiff began working a reduced schedule of six hours per day, thirty hours per week, with a consequent reduction in his pay.

36. Plaintiff initially suffered financial hardship because Defendant did not approve his request for partial disability benefits until two years later. Defendant retroactively approved Plaintiff for partial disability benefits under its short-term disability ("STD") policy for the period May 29, 2012 to October 17, 2013.

37. Defendant resisted Plaintiff's request for a modified work schedule pressured Plaintiff to resume an eight-hour workday and proposed that Plaintiff lie down to rest at work during the day.

38. On December 5, 2012, Defendant notified certain employees, including Plaintiff, that it was relocating their positions from Long Island, New York to Redmond, Washington. Defendant offered relocation bonuses to the affected employees except for Plaintiff.

39. On December 6, 2012, Plaintiff requested to defer his relocation based on his medical condition and treatment, which involved extensive tests to identify the source of his pain. Plaintiff subsequently received permission to delay relocating up to July 2014.

40. On December 21, 2012, Plaintiff underwent a testicular ultrasound. The ultrasound indicated marked tortuosity and thickening of the distal spermatic cord, which raised the possibility of intermittent or chronic partial torsion of the spermatic cord/testicle.

41. On January 11, 2013, Plaintiff submitted an updated letter from Dr. Sheinfeld's office requesting light duty for Plaintiff and restricting Plaintiff from sitting for more than six hours per day.

42. On or about January 15, 2013, Defendant proposed to accommodate Plaintiff's disability by providing a sit/stand desk instead of the modified work schedule Dr. Sheinfeld recommended. Plaintiff responded to Defendant's proposal by renewing his request for accommodation in the form of a reduced work schedule, which request Defendant denied.

43. Plaintiff took leave under the Family and Medical Leave Act for the birth of his son from February 1 to March 4, 2013.

44. Defendant's desire to get rid of Plaintiff became increasingly more evident. While Plaintiff was on FMLA leave, for example, human resources informed Plaintiff that it was preparing a severance package for him.

45. Defendant subsequently offered Plaintiff six months' severance and to continue Plaintiff's medical coverage for a period of eighteen months. Plaintiff did not accept the offer because he strenuously wanted to work and to be productive.

46. On March 1, 2013, Defendant informed Plaintiff that it was going to defer his relocation until June 29, 2013.

47. Plaintiff returned from FMLA leave on March 5, 2013.

48. On March 7, 2013, Plaintiff advised Defendant that he had been experiencing pain since he returned to work.

49. On March 19, 2013, Plaintiff's physician, Harvey Lerner, M.D. ("Dr. Lerner"), provided Plaintiff with a letter indicating that Plaintiff experienced pain after working four to five hours and restricting Plaintiff from sitting and standing for more than six hours.

50. Defendant refused and/or failed to grant Plaintiff's request for a modified work schedule until March 29, 2013.

51. In or about March 2013, Defendant reassigned Plaintiff from the DLP Outlook Team to a team in Redmond, WA responsible for gathering business intelligence about Microsoft Office 365 (the GLS Team), even though the DLP Outlook Team continued its work.

52. The GLS Office 365 assignment was less appropriate for Plaintiff than the DLP Outlook assignment because it required Plaintiff to be "on call" and to work extremely long hours. The Office 365 assignment was contrary to, and interfered with Plaintiff's approved modified work schedule.

53. Plaintiff complained to human resources that the intensive work required by the Office 365 assignment was not appropriate for his medical condition, but human resources disregarded Plaintiff's complaint.

54. Plaintiff asked permission to work from home when possible to accommodate his disability. The Redmond team had several non-disabled members who were permitted to, and did, work from home.

55. Although Plaintiff performed his work on the Redmond team remotely from Defendant's Long Island office, Defendant would not allow Plaintiff to work from home as he had requested.

56. In or about April 2013, Defendant proposed to accommodate Plaintiff's disability by providing a sit/stand workstation, but Defendant's proposed accommodation did not allow Plaintiff to increase his work schedule because he needed to lie down after six hours of work in order to alleviate his pain. Moreover, the sit/stand station caused Plaintiff to stick out like sore

8

thumb and tower over his colleagues, thereby exposing the private and sensitive nature of Plaintiff's medical condition.

57. In or about June 2013, human resources issued Plaintiff yet a new job description and re-tasked Plaintiff to an empty assignment that lasted only two weeks. At the conclusion of the two weeks, Defendant shuffled Plaintiff to the SI Office 365 team in Redmond, Washington.

58. On July 11, 2013, Plaintiff consulted with Dr. Sheinfeld to assess the cause of continuing pain in the scrotum. Dr. Sheinfeld's office provided a letter, dated July 11, 2013, indicating that Plaintiff was also being treated for low testosterone, which can cause fatigue, and restricting Plaintiff from working for more than six hours per day due to scrotal pain and fatigue.

59. On July 24, 2013, Plaintiff underwent a left spermatic cord block, a diagnostic procedure by which local anesthetics and anti-inflammatory agents are delivered at predefined locations along the spermatic cord, to determine if specific fiber deactivation would provide pain relief and to rule out a neurological or psychological cause for Plaintiff's pain. The cord block usually only provides temporary relief lasting only hours, days or weeks depending upon the individual patient.

60. Defendants unjustifiably concluded that the temporary spermatic cord block permanently resolved Plaintiff's chronic scrotal pain and that, therefore, Plaintiff no longer required a modified work schedule. Accordingly, Defendants discontinued Plaintiff's partial disability benefits. In fact, however, the results of Plaintiff's spermatic cord block demonstrated a scrotal pathology and ruled out neurological and psychological explanations for Plaintiff's chronic pain. Plaintiff received only eighty percent of his salary for the period October 18, 2013 through October 2014.

61. On December 4, 2013, John Mulhall, M.D. ("Dr. Mulhall") documented that Plaintiff's pain made it extremely difficult for him to work long hours and asked Microsoft to accommodate Plaintiff's disability by continuing the modified work schedule.

62. During the period that Plaintiff worked a modified work schedule, he performed work for Defendant at home, after lying down to alleviate his pain, without compensation.

63. In or about February 2014, Defendant responded to Plaintiff's renewed request for reasonable accommodation by trying to reassign Plaintiff from the Microsoft Office 365 task force, to which he was a key contributor, to Defendant's Long Island office, which would soon be closing. Thus, Defendant discriminatorily reassigned Plaintiff from a viable position to a position that it would soon eliminate.

64. On March 22, 2014, Plaintiff filed a complaint with the EEOC alleging that Defendant was discriminating against him because of his disability.

65. Plaintiff complained that Defendant was placing tremendous pressure on him to move from his current assignment-a viable and ongoing project for which he was well suited-to an inferior and less appropriate assignment on Long Island and that the constant change in Plaintiff's assignment was detrimental to him.

66. On May 13, 2014, Rodney Daniel, M.D. ("Dr. Daniel") noted that Plaintiff's testicular pain was aggravated by sitting and, therefore, Plaintiff was restricted from prolonged sitting. Thus, even Defendant's physician agreed that Plaintiff required accommodation.

67. On June 26, 2014, Dr. Lerner indicated that Plaintiff suffered chronic pain made worse by standing or sitting for extended periods.

68. On or about July 10, 2014, Defendant informed Plaintiff that it was closing its Long Island location and that his position was being "eliminated." Defendant offered Plaintiff two

weeks' severance for each year of service with Microsoft and six month's health coverage, which Plaintiff declined to accept because it was conditioned upon Plaintiff's releasing Defendant from any and all liability for any all claims, including claims for medical expenses incurred after the six months expired.

69. Plaintiff applied for, but was denied, positions with Defendant in Redmond, WA for which he was well qualified. Defendant filled the positions with non-disabled individuals who were less qualified than Plaintiff.

70. In or about September 2014, Plaintiff received a $5,000 bonus in recognition for his excellent work on the Office 365 assignment.

71. Plaintiff's employment with Defendant terminated in or about October 2014.

72. Other, non-disabled members of Plaintiff's team, however, continued to work from Long Island even after Plaintiff's employment was terminated.

## FIRST CLAIM FOR RELIEF

### Discriminatory Discharge in Violation of the ADA

73. Plaintiff repeats and realleges each and every allegation contained herein.

74. Defendant discriminated against Plaintiff in the terms and conditions of his employment because of Plaintiff's disability and/or perceived disability.

75. As a proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer loss of past and future earnings and employment-related benefits, mental anguish, embarrassment, humiliation, and other incidental and consequential damages.

76. Defendant discharged Plaintiff in conscious disregard of Plaintiff's rights, thus Plaintiff is entitled to an award of punitive damages.

## SECOND CLAIM FOR RELIEF

### Retaliation in Violation of the ADA

77. Plaintiff repeats and realleges each and every allegation contained herein.

78. Plaintiff made a complaint of discrimination against Defendant with the EEOC.

79. Defendant retaliated against Plaintiff because of his protected activity first by terminating Plaintiff's employment and subsequently denying Plaintiff employment opportunities in Redmond, WA for which he applied and was well qualified..

80. As a proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer loss of past and future earnings and employment-related benefits, mental anguish, embarrassment, humiliation, and other incidental and consequential damages.

81. Defendant retaliated against Plaintiff in conscious disregard of Plaintiff's rights, thus Plaintiff is entitled to an award of punitive damages.

## THIRD CLAIM FOR RELIEF

### Failure to Accommodate in Violation of the ADA

82. Plaintiff repeats and realleges each and every allegation contained herein.

83. Defendant was aware of Plaintiff's disability and need for reasonable accommodation.

84. Defendant failed to make reasonable accommodation for Plaintiff's disability.

85. Defendant discriminated against Plaintiff in the terms and conditions of his employment because of Plaintiff's disability and/or perceived disability.

86. As a proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer loss of past and future earnings and employment-related benefits, mental anguish, embarrassment, humiliation, and other incidental and consequential damages.

87. Defendant refused and/or failed to accommodate Plaintiff's disability in conscious disregard of Plaintiff's rights, thus Plaintiff is entitled to an award of punitive damages.

## FOURTH CLAIM FOR RELIEF

### Discriminatory Discharge in Violation of the NYSHRL

88. Plaintiff repeats and realleges each and every allegation contained herein.

89. Defendant discriminated against Plaintiff in the terms and conditions of his employment because of Plaintiff's disability and/or perceived disability.

90. As a proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer loss of past and future earnings and employment-related benefits, mental anguish, embarrassment, humiliation, and other incidental and consequential damages.

## FIFTH CLAIM FOR RELIEF

### Retaliation in Violation of the NYSHRL

91. Plaintiff repeats and realleges each and every allegation contained herein.

92. Plaintiff made a complaint of discrimination against Defendant with the EEOC.

93. Defendant retaliated against Plaintiff because of his protected activity first by terminating Plaintiff's employment and subsequently denying Plaintiff employment opportunities in Redmond, WA for which he applied and was well qualified..

94. As a proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer loss of past and future earnings and employment-related benefits, mental anguish, embarrassment, humiliation, and other incidental and consequential damages.

95. Defendant retaliated against Plaintiff in conscious disregard of Plaintiff's rights, thus Plaintiff is entitled to an award of punitive damages.

## SIXTH CLAIM FOR RELIEF

### Failure to Accommodate in Violation of the NYSHRL

96. Plaintiff repeats and realleges each and every allegation contained herein.

97. Defendant was aware of Plaintiff's disability and need for reasonable accommodation.

98. Defendant failed to make reasonable accommodation for Plaintiff's disability.

99. Defendant discriminated against Plaintiff in the terms and conditions of his employment because of Plaintiff's disability and/or perceived disability.

100. As a proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer loss of past and future earnings and employment-related benefits, mental anguish, embarrassment, humiliation, and other incidental and consequential damages.

## DEMAND FOR JURY TRIAL

101. Plaintiff repeats and realleges each and every allegation contained herein.

102. Plaintiff demands a trial by jury.

**WHEREFORE**, as a result of the unlawful conduct and actions of the Defendant herein alleged, Plaintiff demands judgment as follows:

a. Declaring that Defendant violated the aforementioned statutes;

b. Awarding Plaintiff compensatory and punitive damages;

c. Awarding Plaintiff back pay, front pay in lieu of reinstatement, and all the benefits to which Plaintiff would have been entitled to receive but for the termination of his employment;

d. Granting Plaintiff equitable relief including reinstatement;

e. Awarding Plaintiff attorneys' fees and the costs and disbursements of this action;

 f. Awarding Plaintiff pre- and post-judgment interest;

 g. Such other and further relief as the Court deems just and proper.

Dated: Hauppauge, New York
   December 21, 2015

          LAW OFFICE OF PETER A. ROMERO

          /s
    By: _____
          Peter A. Romero, Esq.
          503 Route 111
          Hauppauge, New York 11788
          (631) 257-5588
          peteraromero@gmail.com

          *Attorney for Plaintiff*